AMORY L. HASKELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 103967. Promulgated January 27, 1942.

*Ambrose L. O'Shea, Esq.*, for the petitioner.
*Dean P. Kimball, Esq.*, for the respondent.

OPINION.

DISNEY: This proceeding involves income taxes for the calendar year 1937 in the amount of $33,479.82, the entire deficiency determined. The question for examination is whether income received by the petitioner was distributed as a part of a complete liquidation by a corporation under section 115 (c) of the Revenue Act of 1936,[1]

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income except in the case of amounts distributed in complete liquidation of a corporation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding two years from the close of the taxable year during which is made the first of the series of distributions under the plan. In the case of amounts distributed (whether before January 1, 1934, or on or after such date) in partial liquidation (other than a distribution within the provisions of subsection (h) of this section of stock or securities in connection with a reorganization) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits.

or whether gain is to be recognized under section 117 (a) of the Revenue Act of 1936.[2]

The case was submitted upon stipulations, and exhibits attached and referred to therein. Certain objections to some of the exhibits were overruled, and we find the facts to be as so stipulated. We set forth herein only those portions thereof deemed pertinent to discussion of the issue.

The petitioner, who filed his income tax return for the calendar year 1937 in the first district of New Jersey, at Camden, New Jersey, was a stockholder in, and the president of, Triplex Safety Glass Co. of North America, hereinafter referred to as the company. He received from the company in 1937 as distributions in liquidation and reported as income the sum of $143,157.10. He computed his income tax on the theory that the distributions were in complete liquidation of the company, and therefore reported taxable long term gain, under section 117 of the Revenue Act of 1936, of 40 percent on certain preferred stock held more than five years at the date of the distribution and 30 percent on certain common and preferred stock held for more than ten years at the date of the distribution. There seems no dispute as to the periods of holding, the amounts received, or the actual gain realized. The respondent determined that the distributions were received in partial liquidation and included 100 percent of the gain in petitioner's income, resulting in the deficiency above stated. The question, therefore, turns upon whether the company distributed to the petitioner in 1937, by way of complete liquidation as petitioner argues, or partial liquidation as respondent contends, conceding that there was distribution in liquidation.

From December 31, 1928, until after the taxable year the company, organized to manufacture reinforced glass, was in litigation over alleged infringement of its patents. The result, after the case had been taken to the Supreme Court of the United States and sent back to the District Court, was a master's report on July 9, 1937, recommending that the company recover from Pittsburgh Plate Glass Co. (hereinafter called Pittsburgh) $1,560,378.59. On July 29, 1937, Pittsburgh paid the company $1,008,858.08 on the account, which amount was accepted under written stipulation that payment was

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

100 per centum if the capital asset has been held for not more than 1 year;

80 per centum if the capital asset has been held for more than 1 year but not for more than 2 years;

60 per centum if the capital asset has been held for more than 2 years but not for more than 5 years;

40 per centum if the capital asset has been held for more than 5 years but not for more than 10 years;

30 per centum if the capital asset has been held for more than 10 years.

without prejudice to further claims. With due diligence, the company on October 28, 1937, brought before the District Court its motion to confirm the master's report. On February 17, 1938, that court held that Pittsburgh was liable to the company for $1,520,378.59. Cross-appeals were perfected May 24, 1938, and the case was argued and submitted to the Third Circuit Court of Appeals on the record and briefs on December 12, 1938. On January 29, 1940, the matter was reargued to the Third Circuit Court of Appeals, pursuant to its directions. Delay in the decision of the matter was due to the reargument, and was beyond the control of the company. Decision was rendered by the Circuit Court on March 7, 1940.

The company on its income tax returns for 1930 to 1932, inclusive, reported as accrued income amounts claimed to be due for the patent infringement involved in the litigation above described. Prior to a resolution of its stockholders on November 16, 1937, below described, the company's officers had considered the possibility of Federal income tax for that year because of the payment from Pittsburgh and had computed a possible maximum income tax of $199,156.20, and set up a reserve therefor at that time of about $200,000. In March 1938 an internal revenue agent reported to the company that its 1937 income and excess profits tax liability was $197,465.46. The company had been advised by counsel at the time of the resolutions in 1937, and was advised later that there was, in counsel's opinion, no income or excess profits tax liability in 1937 upon the payment from Pittsburgh. The claim for excess profits tax was successfully resisted, and on July 16, 1938, the Commissioner allowed the claim of the company for exemption from the provisions of the capital stock tax law and has not since claimed that the company is subject thereto. Resistance to income tax being unsuccessful, it was paid June 13, 1939, claim for refund was filed, and on January 5, 1940, suit was filed for recovery in the amount of $136,727.62. That suit was still pending at the time of the hearing herein.

From January 1, 1937, to the present time the company has engaged in no activities other than the prosecution of the above detailed litigation, and tax controversy with the United States Government over its income, capital stock, and excess profits taxes; and since November 16, 1937, the date of the above mentioned adoption of resolutions by the company's stockholders, has been in process of winding up its affairs. The claim for patent infringement was at all such times practically the only asset of the company.

On August 26, 1937, the president of the company stated the situation to a directors' meeting, reciting the payment received from Pittsburgh, the prosecution of the claim for the balance found due by the master, the fact that the company had certain obligations,

and possible tax liability (though counsel had advised otherwise) for which it was recommended that about $240,000 be reserved, leaving, out of the payment from Pittsburgh, $531,000. He suggested that a stockholders' meeting consider liquidation of the company, as of December 3, 1937. The board of directors accordingly resolved to retain $240,000 for possible tax claims, current expenses, and patent litigation, and that $531,000 be distributed in liquidation of the company as of December 3, 1937, that a special meeting of stockholders be called to approve such action, and that the officers be authorized to take steps necessary to collect the balance due from Pittsburgh.

Notice was given of a special meeting of stockholders to be held November 16, 1937, for the purpose of considering authorizing the prosecution of the claim for the remainder due from Pittsburgh, to authorize the officers to proceed with the orderly liquidation of the company and distribute funds currently available in liquidation, to appoint an agent for the complete liquidation of preferred stock and partial liquidation of common stock, and to distribute, on surrender of the certificates for cancellation $154.50 per share of preferred stock in complete liquidation thereof, and after setting aside a sum sufficient for complete liquidation of the preferred stock, to pay out $1.70 per share in partial liquidation of the common stock, all as of December 3, 1937. A letter from the president of the company accompanied the notice of the stockholders' meeting, explaining the situation as above outlined and the existence, after payment of obligations and reserves for liabilities, of funds sufficient to completely liquidate preferred stock and partially liquidate the common stock.

On November 16, 1937, the stockholders passed resolutions authorizing the reservations for liabilities, the continuance of prosecution of the claim of the balance due from Pittsburgh, and the liquidation of the company, in full as to preferred stock and partial as to the common stock, and to that end to appoint an agent to take steps to accomplish the complete liquidation of the preferred stock and partial liquidation of the common stock, and to pay as of December 3, 1937, $154.50 per share in full liquidation of the preferred stock on surrender of the certificates for cancellation and $1.70 per share in partial liquidation of the common stock. It was further resolved:

And pursuant to paragraph 3, sub-division (d) of the Notice of the Meeting, dated October 14, 1937, that the officers be and they are hereby empowered at their sole and full discretion to make any other and further disbursements to the Common Stockholders as may be warranted, should there be any further receipt on account of damages from Pittsburgh Plate Glass Company between this date and December 31, 1937.

On November 22, 1937, the president and the secretary of the company wrote a letter to the stockholders, notifying them that on

November 16, 1937, at a special meeting, the stockholders had resolved to authorize the complete liquidation of the preferred stock and the partial liquidation of the common stock, and notifying the stockholders to surrender the certificates of preferred stock for cancellation and the certificates of common stock for endorsement stamp. The petitioner, pursuant to such notice, surrendered his certificates of common stock for stamping, and about December 3, 1937, received thereon $102,523.60 and the subsequent return of the certificates; also surrendered his certificates of preferred stock and received in payment therefor $40,633.50.

On March 25, 1938, a special meeting of the board of directors of the company was held at which there was considered a proposition from Pittsburgh that they would pay the additional claim for patent infringement in the amount of approximately $515,000 provided the company would not appeal on the question of interest, but otherwise a cross-appeal on the question of $515,000 would be taken. After discussion including consideration of possible income tax, though it was stated counsel advised there was such liability in the matter, it was resolved that counsel be instructed to proceed with an appeal, and that the views of some of the larger stockholders be obtained on the subject.

On September 19, 1938, the internal revenue agent in charge wrote the petitioner proposing adjustments resulting in a deficiency of tax in the amount of $33,479.82 in effect because of the view expressed that though it appeared to be the intention of the company to liquidate the entire capital stock of the company, the facts available did not indicate that the plan of liquidation specified a time in which the transfer of the property is to be completed and that it was held therefore that the distributions were not in complete liquidation of the corporation within the meaning of section 115 (c) of the Revenue Act of 1936.

At a directors' meeting on October 25, 1938, the president of the company stated the situation, in effect, that $199,160 had been reserved for tax liabilities, that on November 16, 1937, a plan for complete liquidation of the company had been adopted, that though an original assessment of $197,465.48 had been proposed, this upon reconsideration after protest had been reduced to about $127,000, that therefore about 30 cents per share on common stock could be distributed "as a partial distribution in accordance with the plan for complete liquidation of the company as heretofore adopted." The directors passed resolutions accordingly, referring to the previous plan for prompt and complete liquidation of the company and authorizing distribution of 30 cents per share "as a further partial liquidation" and authorizing the officers to take all necessary steps "for such further partial

liquidation of the common capital stock" and authorizing the officers to appoint an agent to make such payment "in partial liquidation of the common capital stock", referring further to the distribution to be made "as a further partial liquidation" and further resolving as follows:

RESOLVED FURTHER that pursuant to the plan for the complete liquidation and dissolution of this Company, as adopted at the Special Meeting of the Stockholders duly called and held on the 16th day of November, 1937, the officers of this company are hereby directed to complete the liquidation of the Company and to take such steps as may be requisite for the purpose of dissolving the Company not later than December 31, 1939.

On November 21, 1938, the stockholders of the company were advised by letter from the president and the secretary that due to decision of the Income Tax Bureau of the Internal Revenue Department the full amount theretofore reserved for Federal taxes need not be maintained and that the directors had released from the reserve an amount sufficient to pay 30 cents per share on the common stock "as a second payment in the series toward the complete liquidation of the Common Capital Stock of the Company."

On January 31, 1939, the annual meeting of the stockholders of the company was held. The following resolution was passed:

RESOLVED FURTHER that all the acts of the Board of Directors and the officers of the Company in distributing the sum of $54,679.50 as a further partial liquidation of the common stock of the company, pursuant to the plan heretofore adopted by the stockholders of this Company for the prompt and complete liquidation and dissolution of the company be and the same are hereby approved, ratified and confirmed.

At the regular meeting of the board of directors on February 2, 1939, the chairman reported that in their regular meeting on January 31, 1939, the stockholders had, among other things, "approved a plan for the complete liquidation of the company by December 31, 1939."

At the regular quarterly meeting of the directors on October 31, 1939, there was discussion of the fact that the stockholders had authorized dissolution not later than December 31, 1939. The president of the company reported that such dissolution might be impossible by the end of the year since the expected decision of the Third Circuit Court of Appeals had not yet been handed down, although the company was to all intents and purposes already liquidated except for the claim against Pittsburgh.

On January 9, 1940, the president and the secretary of the company notified the stockholders that no decision had as yet been rendered by the court and that "Accordingly, it is necessary to continue the corporate existence of our Company until such time as a final determination of that case is had from the Courts." At the annual stockholders' meeting on January 30, 1940, the president

reported *inter alia* that a decision had not yet been rendered by the court and it was therefore not possible to carry out the stockholders' directions for complete liquidation not later than December 31, 1939. Thereupon a resolution was adopted approving the actions of the board of directors in prosecuting the appeal and in instituting a suit against the collector of internal revenue, and repealing the stockholders' resolution at the last annual meeting that the date for complete liquidation be fixed at not later than December 31, 1939, and that in lieu thereof the following resolution be adopted:

RESOLVED FURTHER that the date for the complete liquidation and dissolution of the Company be and the same is hereby fixed at not later than December 31, 1940 and that the plan of liquidation adopted at the Special Meeting of the Stockholders held on November 16, 1937 be reaffirmed to the end that the same shall be completely accomplished before December 31, 1940.

At a special meeting of the board of directors on March 15, 1940, the officers were instructed to proceed as rapidly as possible in the complete liquidation of the company "and when, as and if the Pittsburgh Plate Glass Company shall have complied with the mandate of the court and liquidated its indebtedness counsel and treasurer be prepared to submit to the Board of Directors a plan for this complete liquidation, distribute to stockholders all assets except what cash will be required to prosecute the claim for tax recovery and to consider the advisability of issuing to each stockholder script for his pro rata share in such recovery if received * * *."

At a special meeting of the board of directors on May 13, 1940, a resolution was adopted referring to passage of a resolution for complete liquidation on November 16, 1937, and providing, *inter alia*, that there is $371,820.60 available for final liquidation to the stockholders and that therefore, pursuant to and in continuation of the plan adopted November 16, 1937, and the resolutions adopted January 31, 1939, as amended, the following plan for the "final and complete liquidation of the Company be and the same is hereby adopted and recommended for adoption by the stockholders * * *." A special meeting of the stockholders was called for June 18, 1940, to pass upon the proposals, which were in effect that all common stock be canceled and $2.04 per share be paid thereon in full and complete liquidation and that liquidating certificates be issued to the stockholders for their interests, if any, in any further liquidation distribution, and "That this plan for final and complete liquidation of the Company be consummated and completed on or prior to December 31, 1940." On June 18, 1940, such proposals were, in effect, adopted by the stockholders.

The petitioner's position is that he is entitled under section 117 (a) of the Revenue Act of 1936 to report less than 100 percent of the gain realized by him upon the corporate distributions received be-

cause under section 115 (c) of the Revenue Act of 1936 they were received as part of a "complete liquidation" defined by that section as one in complete cancellation of all stock in accordance with a bona fide plan under which the transfer is to be completed within a time specified in the plan not exceeding two years from the close of the taxable year during which is made the first of the series of distributions under the plan. He argues in brief that the company adopted a bona fide plan of liquidation of all of its stock, that the plan specified a date, within two years from the close of the taxable year within which the transfer of the property was to be completed, either in the original plan as shown by corporate resolutions passed in 1937, setting the date as December 31, 1937, or by amendment thereof by corporate resolution in 1938, specifying the period as ending December 31, 1939; further, he says that the statute does not require the distribution actually to be made within the two-year period, and that therefore the fact that it was not so made is immaterial. The respondent on his part, although conceding that the plan was one of liquidation, argues that it was not one of "complete liquidation" within the statute because no time limit was set, and that the resolutions in the following year did not serve, and were not intended to serve to fix a time limit affecting the distribution made in the prior year, and that if there was amendment in 1938 to provide a time limit *nunc pro tunc* for the distribution made in 1937, then there was in 1940 repeal thereof and a change of the time limit to three years, and that a three-year plan does not come within section 115 (c), Revenue Act of 1936. He further argues that the plan was not bona fide because the company was at all times concerned with the question of Federal income taxes, and that the revenue agent had pointed out to the taxpayer the lack of a time limit in the plan.

We will first consider what appears to be the point most stressed by both parties, to wit, whether the plan of liquidation specified a time not exceeding two years from the close of the taxable year in which the first distribution is made, within which the liquidation is to be completed.

The petitioner says on this point that there was such time specified because of the following language in the stockholders' resolution of November 16, 1937:

RESOLVED: * * *

(d) And pursuant to paragraph 3, subdivision (d) of the notice of the meeting, dated October 14, 1937, that the officers be and they hereby are empowered at their sole and full discretion to make any other and further distributions to the common stockholders as may be warranted should there be any further receipt on account of damages between this date and December 31, 1937.

December 31, 1937, was therefore, he argues, the termination of the time specified. The respondent calls such contention an afterthought

and points out that the petition contains no such allegation or view. We think that examination of the pleadings justifies the respondent's view. The petition does allege that the Commissioner erred in holding that no time limit was specified in the resolutions passed by the board of directors and stockholders, and that the Commissioner erred in failing to hold that the resolutions passed November 16, 1937, stated a plan of liquidation, and further erred in failing to hold that by resolutions adopted October 25, 1938, the officers were directed to complete the liquidation not later than December 31, 1939; but neither allegations of error nor the statement of facts relied upon indicate any theory that the resolutions adopted November 16, 1937, contained any specification of time within which liquidation should be completed. On the contrary, the petition indicates a view that on November 16, 1937, a plan of liquidation was stated, and on October 25, 1938, a time limit was specified as two years from December 1937. We think that the petitioner did not at the time of filing this proceeding entertain a theory that the resolutions of November 16, 1937, specified a date within which liquidation was to be completed.

Nor do we think that such resolutions did in fact specify such time. When analyzed, the resolution relied upon is found to state that the officers are empowered in their discretion to make distributions to the common stockholders as may be warranted "should there be any further receipt on account of damages between this date and December 31, 1937." It seems obvious to us from the context and the whole tenor of the paragraph that the date December 31, 1937, refers to the time within which there might be "further receipt on account of damages" thereby empowering the officers to make further distributions, but that such distributions might be made at any time thereafter so far as any limitation being set is concerned. It would require distortion of the language to hold that the words "to make any other and further distributions" must be read as if followed immediately by "between this date and December 31, 1937", when the words actually immediately preceding the latter expression and not separated therefrom even by a comma are "should there be any further receipt on account of damages." If there had been any further receipt on account of damages on December 30, 1937, the officers on petitioner's theory would have been authorized to distribute it, yet likewise on their theory they would have been required to distribute it, if at all, on the same date. We think the only reasonable construction calls for reading and considering the language in the order it was actually used and that the officers were empowered to distribute "should there be any further receipt on account of damages between this date and December 31, 1937", but that the time within which they might distribute was in nowise limited. This view

is consonant, we think, with the situation at that time. Litigation was pending in the United States Circuit Court of Appeals for the Third Circuit, involving at least $500,000, and complete liquidation was dependent upon the outcome of that litigation. The resolutions of November 16, 1937, arranged for the further diligent prosecution of that litigation and for the expense thereof, including payment of future legal fees. Though of course it is possible that there might have been some hope that by December 31, 1937, only 45 days after the date of the resolutions, such litigation might be terminated and the proceeds thereof ready for distribution, no evidence so indicates and we think that considering the preparations for litigation there can not reasonably be said to have been any such hope. Certainly in our view there was no intent, under all the circumstances, to set only a period of 45 days within which to complete the liquidation. The litigation, in fact, continued for more than two years, and though much of that time is not to be ascribed to any fault or delay on the part of the company, nevertheless we think it obvious that on November 16, 1937, there was no expectation that the corporation could be liquidated by the end of the year. Indeed, upon brief the petitioner, discussing the resolution of October 25, 1938, says: "At that time the appeals in the patent suit had been perfected and were sure to be reached for argument within the following two months." Since apparently some such period as two months is considered by the petitioner reasonable within which to expect argument after perfection of the appeals, it appears to us that the end of litigation, payment and distribution could not have been expected within six weeks after November 16, 1937, before the litigation had reached the state of perfected appeal.

Again, in the minutes of the board of directors on October 30, 1939, appears a statement that the previous authorization of the officers to dissolve by December 31, 1939, was discussed, and that the president reported that the dissolution would take place, if possible, but the decision of the court had not yet been handed down "and unless such decision were handed down by the end of the year it might be impossible for the officers actually to dissolve the corporation * * *." If as late as October 31, 1939, after the litigation had been pursued for almost two years after the date of the resolutions of November 16, 1937, it was still the opinion of the president that dissolution would not be possible unless the decision were handed down by the end of the year, it seems to us wholly unreasonable to think that much earlier in such litigation, on November 16, 1937, there was any expectation that the litigation would be ended, distribution made, and the corporation dissolved by the end of the year 1937. After the decision in the Circuit Court, on June 18, 1940, resolutions pro-

vided for final and complete liquidation. Yet the remainder of the year, to December 31, 1940, was allowed therefor—several times as much time as between November 16, 1937, and the end of that year. Indeed, when the various resolutions and corporate acts throughout the year 1937 are reviewed, they contain indications that as to common stock, only a partial distribution was then contemplated; for reference ·is made in the president's statement on August 26, 1937, to "partial liquidation of the capital stock of the company", while in the resolutions of the directors on the same date reference is made to liquidation of the preferred stock and, thereafter, with the remaining funds·to the partial liquidation of the common ·stock; also to the complete and full liquidation of the preferred stock and the partial.liquidation of the common stock. This reference to complete liquidation of preferred and partial liquidation of common stock is repeatedly used in such resolutions, in the notice of the stockholders' meeting to be held November 16, 1937, in the letter of the president accompanying such notice, in the resolutions of November 16, 1937, and in the letter from the president and secretary of November 22, 1937. These recitations throughout that year seem to us to cast doubt upon the idea of a plan of complete liquidation of both preferred ·and common stock at any time during 1937. We conclude and hold that the language of the resolution of November 16, 1937, does not express or specify a time limit for completion of liquidation within the intendment of section 115 (c) of the Revenue Act of 1936.

We next consider, therefore, whether, as petitioner contends, the resolutions of October 25, 1938, have the effect of incorporating in the plan of liquidation the requisite specification of time limit. We think they do not have that effect with respect to the distribution in 1937 here involved. It seems to us plain that in order to get the benefit of section 115 (c) petitioner must show that at the time of taxability of the distribution to him, there was extant a plan containing the requisite specification of time. The history of the legislation indicates well that the time element was by no means immaterial and that it was intentionally inserted for a purpose. In, our opinion, even if we assume an amendment, on October 25, 1938, of the resolutions of November 16, 1937, it should not be given retroactive effect to cover a distribution prior to that time, but that the distribution when taxable to the recipient must have been under a plan containing the statutory requisite of a specification of a time limit for complete liquidation. Otherwise the distribution was not at that time a part of a complete liquidation.

Respondent asserts, however, that there was in fact no such amendment. We agree with the petitioner that specific words of amendment are not necessary if the tenor of the resolution in fact constituted

the amendment of the earlier resolution. The language relied upon reads as follows:

RESOLVED FURTHER that pursuant to the plan for the complete liquidation and dissolution of this Company, as adopted at the Special Meeting of the Stockholders duly called and held on the 16th day of November, 1937, the officers of this company are hereby directed to complete the liquidation of the Company and to take such steps as may be requisite for the purpose of dissolving the Company not later than December 31, 1939.

The gist of such resolution, in our opinion, is that the officers of the company are, pursuant to plan adopted November 16, 1937, directed to complete the liquidation not later than December 1, 1939. It does not seem to us that this is an amendment of the earlier plan, but that it is at most a reference to it, and a statement that what is now done is done pursuant to the earlier plan. In our opinion there is neither express nor implied amendment of the earlier plan, and when it is recalled that the lack of a time limit specified in the plan had been called to the attention of the company by a revenue agent prior to the passage of the resolutions of October 25, 1938, it appears that the statement in the language above quoted is a rather self-serving reference to the action as being taken pursuant to the plan of November 16, 1937. We do not think that it serves to affect, modify or amend the plan as it existed throughout the year 1937.

Moreover, we find that when it became apparent that because of the litigation the liquidation could not be completed within the time set in the resolution of October 25, 1938, the time was extended, by resolution on January 30, 1940, so as to expire December 31, 1940. This action was of course taken after the expiration of the original time set in the resolution of October 25, 1938, which time expired December 31, 1939. If the resolution of October 25, 1938, was an amendment of the resolution of November 16, 1937, it was repealed expressly by that of January 30, 1940; leaving us to consider the distribution made in 1937, as taken, under petitioner's theory, under a resolution providing for the completion of liquidation within a period of three years from the end of the year 1937. Such period was not, in 1937, allowed, although allowed by section 115 (c) of the Revenue Act of 1938. No logic permits us at this time to view the distribution made in 1937 as made under a resolution of October 25, 1938, when in turn that resolution must be on petitioner's theory considered itself repealed, and another substituted in lieu thereof, in 1940. So that if we consider the matter amended at all, it must be considered as amended by the resolution of January 30, 1940. That resolution and three-year period it provides can not be applied under section 115 (c) of the Revenue Act of 1936, providing only for a two-year limitation. Under the law then effective, it is plain that

176

the distribution, in order to be free from the effect of section 117 (a) of the Revenue Act of 1936, must be under the plan providing a two-year limitation upon completion of liquidation. It is therefore our opinion that the distributions to the petitioner in 1937 were not made under a plan of complete liquidation specifying completion within two years from the end of that taxable year, as required by section 115 (c), Revenue Act of 1936.

This conclusion makes it unnecessary to consider further questions suggested as to whether the plan of liquidation was bona fide and whether it was necessary for the plan actually to be consummated and the liquidation completed within the two years specified in the plan, which admittedly was not done in this case.

We therefore conclude and hold that the respondent did not err in applying to the distributions to the petitioner in 1937 the provisions of section 115 (c) of the Revenue Act of 1936 and including in petitioner's income 100 percent of the admitted gain resultant from such distributions.

*Decision will be entered under Rule 50.*